(No. 20103.—

ARTHUR J. HOPKINS, Admr., Defendant in Error, *vs.*
RALPH HUGHES *et al.* Plaintiffs in Error.

*Opinion filed October 25, 1930.*

WELSH & WELSH, for plaintiffs in error.

NORTH, LINSCOTT, GIBBONEY, NORTH & DIXON, for defendant in error.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

On the petition of Arthur J. Hopkins, administrator of the estate of Sarah J. Owen, deceased, Ralph Hughes and Blanche McCarthy were cited to appear in the circuit court of Winnebago county and answer interrogatories concerning the ownership of certain personal property described in the petition and claimed as assets of the estate of Sarah J. Owen. The county court adjudged the respondents to be the owners of the property in their possession claimed to belong to the estate, and the administrator appealed to the circuit court, which adjudged certain shares of corporate stock to be the property of the respondents and two promissory notes claimed as assets of the estate to be the property of the estate and ordered the delivery of the notes to the administrator. From the judgment ordering the delivery of the notes to the administrator the respondents appealed to the Appellate Court for the Second District, which affirmed the judgment. A writ of *certiorari* was awarded to review this judgment.

Sarah J. Owen was the owner of the notes in question in her lifetime. She died on August 2, 1927. The plaintiffs in error were not her heirs and do not appear by the record to have been related to her. They were a brother and sister and were friends of Mrs. Owen, had been very kind and attentive to her and she had a warm affection for them. About a week before her death she asked Hughes to bring Frank Welsh, a lawyer, to her house. Hughes asked Welsh to go to the house and he himself went there, but they did not go together. Mrs. Owen was sick and in bed. Welsh and Hughes were in the house about a half hour, and during their visit the securities involved in this proceeding were produced from a tin box which was in a

drawer of a dresser in Mrs. Owen's bed-room up-stairs, where she was lying sick. The decision of this case depends upon what occurred during that half hour visit in Mrs. Owen's bed-room.

Hughes testified that he got a key to the box at Mrs. Owen's direction. She was in bed during the whole visit. He opened the box at Mrs. Owen's request and three certificates of stock in the Roper Corporation for fifty-four shares of stock in the aggregate, of the par value of $100 a share, two demand promissory notes called in the record Burr-Hughes notes, an abstract of title, a deed and other papers were taken out. The Burr-Hughes notes were the notes which are in controversy on this appeal, one being for $2500, on which there is a credit of $350, executed by the Burr-Hughes Company, and the other for $2000, executed by Ralph Hughes. Hughes further testified that on that day Mrs. Owen signed her name to the three certificates of the Roper Corporation stock, the two demand notes of Burr-Hughes, and a deed. Welsh wrote in the deed a description of the property and also a clause giving Mrs. Owen the use of the property during her life and took the acknowledgment of it. Mrs. Owen did not subscribe her name to anything except the deed, certificates of stock and the two notes. There was nothing in the writing that she subscribed reserving the income of the stock or notes. Hughes' testimony further continued, as shown by the abstract: "When she endorsed the certificates of stock and notes to my sister and myself she said, 'I want you to pay my just debts incident to my sickness, my death, my funeral, provide perpetual care for my cemetery lot and provide two markers for my grave and my daughter's,' which I agreed to do and which has been done. She said she thought I was a good boy and that she would like to have me have this stock. She did not deliver the stock to me. She said to Frank Welsh that she wanted him to take the abstract and the deed which she had just signed to his office, to be

delivered in due time to Mrs. Hopkins. She wanted him to take the Roper stock and deliver it to my sister and me. She wanted him to take the Hughes—Burr-Hughes—demand notes, take them to his office and hold them until I produced receipts for the bills paid, when he was to turn them over to me. She said the stock was to be turned over to my sister and me. She didn't say when. The Roper stock was to be turned over immediately, if necessary." Hughes put back the tin box after they were through with it. He drove his car from Mrs. Owen's, Welsh being with him. At the corner of West Jefferson and North Main streets Welsh got out. He gave Hughes certain papers to take to Welsh's office. Hughes went to the corner of State and Main streets and gave the papers Welsh had given him to an office girl there, telling her, "Here are some papers Frank told me to tell you to put in an envelope marked 'Burr-Hughes,' 'Mattie Hopkins' or 'Jennie Owen' or something matter, gave her my seal and blotter which I had."

Mrs. Owen instructed Welsh to take the deed and the abstract and the Roper preferred stock and the Burr-Hughes notes and turn them over to the people they were going to, in Hughes' presence. Hughes took the stock to the office of the Roper Corporation as soon as he could leave the Welsh office, go to his own office and tell his office girl he was going to the Roper Corporation—a matter of fifteen minutes to half an hour. He delivered it to Arthur Glavin, who had charge of the stock certificate records and books of the corporation, and told him to follow the instructions of the endorsements on the back. He did not stay until it was transferred, but new certificates were issued and he got them in the next day or two and has had them in his possession since. There were two of them, each for twenty-seven shares, one in his name and one in his sister's name, in accordance with the assignments on the backs of the certificates. The Burr-Hughes notes were left in the office of Welsh & Welsh. They were in the possession of Frank

Welsh and were held by him until Hughes produced to him receipts for the bills. That was about three or four weeks. He delivered to Welsh receipts showing the payment of claims or bills that he believed Mrs. Owen owed and bills that he had incurred or had paid at her suggestion, including funeral bills and monuments, and they were all the obligations of Sarah J. Owen's estate, so far as he knew.

Welsh testified that after a few minutes' conversation on occasion of his call on Mrs. Owen, when Hughes was there, she asked Hughes to get the box, and he got the key out of the dresser drawer, got the box and placed it on the bed, where it was opened. Mrs. Owen was sitting up in bed and it was opened on her lap. After Mrs. Owen had expressed her uncertainty in regard to what was the right thing to do and he had assured her that the question was what she wanted to do, she finally said, "Well, let's see what is in the box," and the contents were taken out one by one. In regard to the Roper stock he asked her what she wanted to do with that, and she said, "I want Blanche and Bud to have that, I guess." He said to her, "If you transfer that to them you understand it is absolutely transferred and Mr. Hughes will probably take it away to-day?" and she said, "Yes," and right away Welsh took his pen and filled in the assignment on all three certificates, handed the pen to her and she signed the assignments. The certificates were then folded up and handed to Hughes and he put them in his pocket. In regard to the Burr-Hughes notes, Welsh said he asked her the same thing, in substance, regarding that, and they went through the same procedure regarding that. When the abstract was taken out he asked her if the property was in her name, and she answered that it was. He told her the abstract did not show the title in her name and asked if there was a deed to her. She said there was, and finally he found the deed and asked her what she wanted to do with that. She was not sure—she did not know. Welsh told her it was entirely up to her. "Well," she said,

"I guess I want Mattie to have this." Welsh asked her who Mattie was, and she said, "Martha Hopkins." He asked her if she wanted to execute a deed to the property, and she said she did, but she wanted the right to live there as she always had. Welsh took the deed, copied the description, put in a clause reserving the right to the use and occupancy, took it over to her, she signed it and he took her acknowledgment. He took the abstract, the deed and the Burr-Hughes notes, put them in a little package which he held in his hand and said to her, "Regarding these papers, Mrs. Owen, do I understand you that you want me to take these down to my office?" She said, "Yes." He then said, "Now, this deed to Mrs. Hopkins; do you want me to record that?" She answered, "Yes, that is all right." He then said, "I will take it down, then, to my office and take care of it for Mrs. Hopkins. Regarding these Burr-Hughes notes, do you want me to take those and hold those for Bud and Blanche?" She said, "Yes." He testified further that the discussion arose in some way about funeral expenses, markers, and so on, but, anyway, Hughes said, "Auntie, I will take care of the funeral expenses; I will stay there until your body is covered up; I will see to a marker, and I will pay all of the bills that you owe incident to household, perpetual care, and then the balance of these notes I will divide." She said, "Bud, I certainly will be grateful to you if you will do that." Welsh then took the papers, abstract, two notes, contract, his seal and a blotter and some paper, went down-stairs with Hughes, got into the latter's Dodge coupe and asked, "Will you drive me down to the corner of Jefferson and North Main?" They went down there and Welsh said he had an engagement to meet some others at four o'clock and only had a little while to get his golf clubs. Hughes said he would drive him home, but Welsh said, "My car is right over here." He then asked Hughes to take the papers down to his office, telling him to tell his girl to put them in an envelope marked

"Martha Hopkins, Burr-Hughes." Hughes asked what he should do with this Roper stock, and Welsh told him to go and have it transferred, but that perhaps Welsh had better put his witness mark on it and asked Hughes to let him take it. He took the certificates and witnessed the signature of Mrs. Owen and handed them back to Hughes.

This evidence shows conclusively that Mrs. Owen made a completed gift of the shares of stock to the plaintiffs in error. She executed an assignment of them by an endorsement on the back and handed them to Hughes, one of the assignees, with the understanding that it was absolutely transferred, and Hughes took it away with him. He put the certificates so assigned in his pocket and did take them away with him and caused the stock to be transferred in accordance with the assignments. Her directions in regard to the stock were to take it and deliver it to the plaintiffs in error, and it was then delivered to Hughes in her presence. In regard to the notes, Welsh was to hold them until Hughes produced receipts for the bills which he had agreed to pay, and when this was done the notes were to be turned over to him. Welsh understood the difference in the terms of delivery of the stock and notes, and he retained the notes in his own possession in accordance with the condition imposed upon the gift that they were to be retained until receipts for the bills which Hughes was to pay were produced and then the notes were to be delivered to Hughes for the benefit of himself and his sister.

A gift in the nature of a testamentary bequest can become operative only when executed by the donor in writing in conformity with the Statute of Wills. To constitute a gift *inter vivos* there must be a delivery of the property and a parting with all present and future dominion over it, and it is essential to the validity of the gift that it be absolute and irrevocable. It is not essential that the delivery be made directly to the donee but a valid delivery may be made to a third person for the donee. The delivery, how-

ever, must be with the intention of vesting the title absolutely and irrevocably in the donee and the donor must relinquish all present and future dominion and power over the subject matter of the gift. If the gift is not completed during the lifetime of the donor his death revokes the part which has been performed. There must be the intention of making a gift, but intention, alone, that the donee shall have the property does not make a gift. The delivery of the subject of the gift into the possession of the donee or some third person for his benefit is essential, and the delivery must be with the intention of vesting the title and the immediate right of possession of the property in the donee or it will be insufficient. *Taylor* v. *Harmison,* 179 Ill. 137.

The delivery of the notes to Welsh for the plaintiffs in error would have been sufficient if it had been an unconditional delivery. It was not unconditional. If an unconditional delivery to the plaintiffs in error had been intended there was no cause for making the delivery to Welsh to hold for the plaintiffs in error. One of them, Hughes, was present at the time. There was nothing to prevent an absolute delivery to him for himself and his sister. The situation then would not have been different from that of the stock certificates, but for reasons which seemed sufficient to Mrs. Owen she did not make the delivery of the notes like that of the certificates of stock, direct and absolute, but made it to a third person and conditional. The condition was such that it could not be performed in her lifetime. It was, to pay her funeral expenses, the expenses of her last illness and the debts of her estate, and the notes were to be held until these charges were paid and Hughes produced to the custodian of the notes the evidence of their payment. A gift to take effect in the future is not valid, because it is no more than a promise to make a gift and may be revoked at any time by the donor. The pro-

posed gift to the plaintiffs in error of the notes was a gift to take effect in the future and after the death of the donor. It was incomplete, and what had been done was revoked by the death of the donor. It was, moreover, a testamentary disposition of her property, which could only be made by a will duly executed.

The plaintiffs in error rely with much confidence on the case of *Woodburn* v. *Woodburn*, 123 Ill. 608. Peter Ege was the executor of George W. Woodburn's will and the scrivener who wrote it. While he was writing the will a few evenings before the testator's death, the testator's wife at his request brought to him a note of James H. Woodburn, his son, to the testator for $3050, which amounted, with interest, to $8604.52. The testator handed the note to Ege, saying, "You give that note to James in case he does not contest the will." If he contested the will the executor was to collect the note, if he could, for the benefit of Mrs. Woodburn. The executor handed the note to Mrs. Woodburn and told her to take care of it. After the testator's death Mrs. Woodburn gave the note to the executor, told him that everything was satisfactory or had been satisfactory, and for him to give it to James H. Woodburn, and he did so. It was held that this was a complete and valid donation of the note *mortis causa;* that there was, according to Ege's testimony, an absolute delivery of the note to him to be given to James in case he did not contest the will, and if he did, then to collect it for Mrs. Woodburn. The testator never afterwards resumed possession of the note and never manifested any intention or desire to do so. We cannot follow that decision in holding the delivery to be absolute where, unless the donee follows a certain course of action, he is not to receive the subject of the gift. It violates the rule that there must be a delivery of the subject of the gift in the donor's lifetime with the intention of vesting the title immediately and completely

in the donee and not subject to the performance of some condition by the donee prior to such vesting. In this case there was no possibility of the vesting of title in the lifetime of the donor.

The judgment of the circuit court was right, and the judgment of the Appellate Court affirming it is affirmed.

*Judgment affirmed.*