Frederic L. Goff, Jr., Administrator of Estate of George D. French, Deceased, Appellee, v. New Amsterdam Casualty Company, Appellant.

Gen. No. 42,351.

Opinion filed May 5, 1943.

BURT A. CROWE, of Chicago, for appellant.

ROSEN, FRANCIS & CLEVELAND, of Chicago, for appellee; JOHN F. ROSEN and SIDNEY A. WILSON, both of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Miss Josie Edler, who resided at and was employed as a bank teller in New Orleans, was the owner of a black Chevrolet coupe, purchased in April 1935. The New Amsterdam Casualty Company issued its policy insuring her against loss from the liability imposed by law for damages on account of injuries or death in the operation of the automobile between April 22, 1935 and April 22, 1936. The policy contained what is commonly known as an omnibus or extended coverage clause, making it available to any person while operating the scheduled automobile "provided such use or operation is with the permission of the named

assured.'' Miss Edler left New Orleans September 28, 1935 and drove her car to Chicago, arriving on October 2, 1935. George D. French, a widower and a resident of New Orleans, arrived in Chicago a few days before Miss Edler. At that time he was engaged in business in Chicago. He owned a green 1934 or 1935 two door Chevrolet sedan. He lived with his four children, Marion, George, William and Frances in the 7200 block on South Shore Drive in Chicago. Miss Edler lived at the Country Club Hotel, 6930 South Shore Drive, Chicago. They were engaged to be married and she was on a leave of absence from her position with the bank. He kept his car in the Drive-In Garage, 7000 South Shore Drive, and he also drove Miss Edler's car into the same garage and made arrangements for its storage and upkeep. On Sunday, March 15, 1936, while driving Miss Edler's automobile, Mr. French collided with another automobile driven by George Kellerman, and as a result George Kellerman, Lydia Kellerman and Mr. French were killed, and Alberta Bohnhoff sustained bodily injuries. An administrator was appointed for the estate of George D. French, deceased. The administratrix of the estate of George Kellerman, deceased, brought action and recovered a judgment of $7,000 against the administrator of the estate of George D. French, deceased. The administratrix of the estate of Lydia Kellerman, deceased, brought action and recovered a judgment for $4,000 against the administrator of the estate of George D. French, deceased. Alberta Bohnhoff brought action and recovered a judgment of $9,000 against the administrator of the estate of George D. French, deceased. These judgments were entered on June 9, 1939. After the institution of the actions the administrator of the estate of George D. French, deceased, delivered to the casualty company the three summonses in such actions and requested it to defend under the terms and conditions of the policy issued to Miss Josie Edler. The

casualty company caused the appearance and answer of the administrator of the estate of George D. French, deceased, to be entered in each of the actions. The casualty company subsequently advised the administrator of the estate of George D. French, deceased, that the causes of action arising out of the collision were not covered by the policy issued to Miss Edler. Thereupon, the attorneys selected by the casualty company withdrew as counsel for the defendants in each of the cases. The administrator of the estate of George D. French, deceased, filed his amended complaint in the superior court of Cook county against the New Amsterdam Casualty Company, a corporation, alleging that the defendant wrongfully breached the terms of the policy by failing and refusing to defend the actions mentioned and by failing and refusing to pay the judgments; and asked damages in the sum of $20,000, plus interest at the rate of 5 per cent per annum from June 9, 1939. Issue was joined and the case was tried before the court and a jury, resulting in a verdict for the plaintiff in the sum of $22,658.10. Motions by the defendant for a directed verdict, for a judgment *non obstante veredicto* and for a new trial were overruled and judgment was entered on the verdict, to reverse which this appeal is prosecuted.

Plaintiff's theory of the case is that George D. French had implied permission of the assured, Josie Edler, to operate her automobile on the day the accident occurred and that therefore the insurance extended to George D. French as an additional assured under the provisions of the omnibus coverage clause. Defendant's theory of the case is that the assured, under the policy of insurance, was Miss Josie Edler and that George D. French, at the time and place of the operation of her automobile, was not an assured under the policy; that the evidence clearly and without any contradiction shows that the car of Josie Edler was driven by George D. French at the time and place of

the accident without her knowledge, consent or permission, and that defendant was under no obligation to defend the suit brought against the administrator of the estate of George D. French, or to pay any judgments rendered against him on account of the accident.

Asserting that the plaintiff failed to prove the charges of the amended complaint, that the court erred in refusing to direct a verdict in its favor, that the verdict is manifestly against the weight of the evidence, and citing in support of its argument *Byrne for use of King v. Continental Casualty Co.*, 301 Ill. App. 447; *Soukup v. Halmel*, 357 Ill. 576; *Cocos v. American Automobile Ins. Co.*, 302 Ill. App. 442; *People v. Luster*, 292 Ill. App. 244, and numerous other cases, defendant asks that the judgment be reversed. Plaintiff insists that the evidence shows that French operated the automobile with the implied permission of the named assured. We agree with the contention of plaintiff that the permission which the policy contemplates need not be expressly given, that it may arise and be implied from a course of conduct and that it may be shown by circumstantial evidence. In order to determine whether there was competent evidence to establish that French had implied permission to use Miss Edler's car on the day of the fatal collision, we have carefully read the transcript of the testimony. Three depositions were read to the jury, two of which were given by Miss Edler, and one witness appeared in person. The first deposition of Miss Edler was taken at New Orleans at the instance of defendant on January 7, 1940, and the second deposition was taken at the instance of plaintiff at New Orleans on January 2, 1942. The deposition of Frances French, daughter of George D. French, deceased, was taken at New Orleans on July 24, 1941. The only witness called by plaintiff who testified in open court was William Yule. In her second deposition, which was read to the jury

as part of plaintiff's case, Miss Edler testified that she did not see her automobile on the day of the accident. The last time she saw the automobile prior to the accident was about March 13, 1936. Asked as to who made arrangements for the storing of her car at the Drive-In Garage, she answered that Mr. French drove it in for her. He drove the car into the garage "and asked them how much it would be and they told him." She went over there several days after the car was driven into the garage "and told them I wanted my car and they let me have it"; that the car was stored in that garage from October 5, 1935 until the day of the collision. Asked as to who paid the bills for the storage of the car, she answered that she did. She further answered; "I did not pay the amount. I would give Mr. French the money and he would pay them for it whenever it was due." The first day or two after she arrived in Chicago the car was stored in a garage near the Congress Hotel. After that it was always stored in the Drive-In Garage. The garage owner knew that it was her car "because I would go in there and get it and take it out." The monthly storage charges were $10, which Mr. French paid for her. He actually turned the money over to the operators of the garage. She paid Mr. French by cash whenever the storage was due. The bill was paid monthly. She did not receive a receipt for the payment of the storage, nor did she receive any bills for the storage. Asked as to whether Mr. French received any bills for the storage, she answered: "That I couldn't say. I imagine he did." She knew that Mr. French owned a Chevrolet coach automobile, which he also kept in the same garage. He kept it in front of his house most of the time. She frequently drove her automobile. On some occasions she would walk over to the garage and drive the car out, and on other occasions she would telephone and it would be driven to her hotel. When Mr. French and she went out

together they used her car. Asked, "Who generally did the driving?", she answered: "I would or he would Sometimes he would drive and sometimes I would." On the day of the fatal accident she had dinner with the French children at Mr. French's home at about 1:30 p. m. It was a Sunday. Asked, "Did you give him permission to use your car whenever he wanted?", she answered: "As far as I know, yes." The attorney conducting the examination for plaintiff apparently was not satisfied with this answer because he immediately repeated the answer in the form of a question and received the following reply: "Oh, no; he would call me up and ask me if he could use the car and I would give him permission. I didn't give him blanket permission to use the car, or however you say it." She had known Mr. French sixteen and a half years and had been engaged to him since the death of his wife, which occurred in April 1935. She saw him frequently. Asked as to how many times prior to the accident Mr. French had used her automobile, she answered: "Well, he had used it several times to my knowledge." The attorney then inquired as to what she meant by "several times." She answered that she really didn't know "because I know one time he went to the meeting of the Flossmoor Country Club that was held in Chicago, and then another time I let him have it to go out and see some relations of his at the Hyde Park Hotel; and then most of the time when he was in the car I was with him." Asked as to whether when she went out with him in the car, he would get the car and call for her, or she would get the car and call for him, she answered: "Well, sometimes he would get the car and call for me and sometimes we would walk over together and get it. It just depended upon where we were going." Asked: "When he would get the car and call for you, would you give the garage any instructions as to whether or not he should take the car?", she answered: "They never asked me; he

would just walk in and get it." She was then asked: "Did you ever give the garage any instructions as to whether or not he should take the car?" she answered: "No." Asked as to whether she made any arrangements with the garage for Mr. French to use the automobile, she answered: "No." Asked as to whether Mr. French's children used her automobile, she answered: "Well, I know one time that his daughter, Miss Frances French, used the car." Asked whether Frances French got permission from her to use the car, she answered: "The father got permission from me for her to use it; his car was down at Joliet; he had some breakdown or something." Asked: "Did he ever use the car without your permission?", she answered: "Not to my knowledge." Asked: "Had any of his family ever used the car without your permission?", she answered: "Not to my knowledge." She testified that Mr. French did not have a set of keys to the car; that one set of keys was kept in her apartment and the other set was left in the automobile. Asked as to how many times Mr. French used her car when she was not with him, she answered: "Well, as I told you, I know one time when he went to this meeting of the Flossmoor Country Club, and I do know that he went down to the Hyde Park Hotel." Asked as to how she would give him permission to use her car, she answered: "Well, he would call me and ask me and I would tell him yes." He would call her by telephone. Asked: "Did you ever call the garage and tell them to give him the car?", she answered: "No, I did not." Asked as to whether the car was stored in the garage on the day of the accident, she answered that to the best of her knowledge it was there. She did not use the car that day. Asked as to whether she knew for what purpose Mr. French was using the car at the time of the accident, she answered: "No." Asked: "Did you know where he was going?", she answered: "Only what I was told. I don't know." Asked as to

whether she would allow Mr. French to use the car whenever he wanted to use it, she answered: "Whenever he asked me for it. I would let him use it, yes." Asked: "Did you ever refuse him?", she answered: "Not that I know of."

The deposition of Frances McKown of Metairie, Louisiana, taken at New Orleans on July 24, 1941, was then read to the jury as part of plaintiff's case. She is the daughter of George D. French, deceased, and married Ben McKown since her father's death. When she moved to Chicago with her father in the fall of 1935 she was 15 years of age. She knew Miss Josie Edler, but did not know whether or not they were engaged to be married. Witness did not call at Miss Edler's home. Miss Edler did call at witness' home. Asked as to whether she knew if Miss Edler had an automobile, witness answered: "No." Witness knew that her father owned a Chevrolet sedan, which he kept in the Drive-In Garage. Asked whether or not her father ever used Miss Edler's car, she answered: "I didn't know that Miss Edler had an automobile." Asked as to the color of her father's automobile, she answered: "He had a black one and I had a green one." They were both Chevrolet cars. She "understood" that the black Chevrolet coupe was her father's. She spoke about the green Chevrolet sedan as her car. She also testified: "It was really dad's car, it was just taken for granted it was mine." Asked as to whether her father bought the green car for her, she answered: "I don't know whether he bought it for me, but I used it." Asked as to how often her father drove the black coupe, she answered: "I don't know that either." Asked: "Did he have it every day?", she answered: "He had it some, but I really don't know how much. I had my car and I really don't know because I didn't ask." Asked: "Whenever you saw your father driving a car, what car was it?", she answered: "I can't remember ever seeing him drive

a car myself, because whenever we went riding together I used to drive. Dad did not like to drive very much. He was a good driver but he didn't like to drive. I do, so I just drove." Asked as to whether she saw her father driving a black Chevrolet coupe, she answered: "I really don't know. I may have. I can't exactly say it now, but I may have." Asked: "Where did you keep your car?", she answered: "At the Drive-In Garage." Asked: "Was your father's black coupe kept at the same garage?", she answered: "As far as I know it was." Asked whether she ever saw her father's black coupe in there, she answered: "Yes." Asked: "When you used the black Chevrolet coupe, would you have to get permission from anyone to take it?", she answered: "I don't remember. I think dad used to say something about it when I would take it, but I don't remember. I didn't take it but once or twice and that was when absolutely necessary." She had never been out in the automobile in the company of her father and Miss Edler and had never seen her father and Miss Edler together in the automobile. She did not know whether Miss Edler ever used the black coupe and never saw Miss Edler in the black coupe. She did not know whether Miss Edler ever had an automobile. On cross-examination, she said that the accident resulting in the death of her father occurred six years previously. She did not remember, but stated that it was possible that Miss Edler had dinner at her home with witness and her brothers and sister on the Sunday of the fatal accident. Asked whether she knew if Miss Edler owned the black coupe, she answered: "No." She further answered that she did not know who the black car belonged to. Asked if she remembered whether the black coupe had a Louisiana license, she answered she did not remember. She did not know whether Miss Edler drove that car to Chicago or whether Miss Edler had paid the insurance on that car. In answer

to the question: "When I asked you about your car, you said you did not know much about it because you had your own car," she answered: "As far as I knew that was his. I really didn't know about it and had no idea." Asked: "As far as you knew, that was his car?", she answered: "Yes." Asked as to how many times she drove the black coupe, she answered: "Once or twice. I'm not sure. I didn't use it very much, I didn't have need to." Asked as to whether she asked permission from Miss Edler "to use that car at that time," she answered: "Oh, no. I didn't even know it was her car, and I wouldn't have had occasion to ask her." Interrogated as to whether she asked permission to use "that car," she answered: "I imagine I asked my father. It was not my car." She did not know whether her father asked permission of Miss Edler for the use of the car by witness. Asked whether it wasn't a fact that witness used the car once, she answered: "It may be." Asked: "As I understand it you never saw anybody use that car?", she answered: "Not that I can remember. I mean that it did not dawn on me that it was someone else's car, and I didn't have occasion to observe what went on about it." Asked: "You say you may have used it once?", she answered: "No, I used it one time. It may have been more, but I don't remember."

William Yule, the only witness who testified in open court, stated that he operated a gas station and in 1935–6 was in charge of the Drive-In Garage, owned by his father-in-law, H. F. Brandenburg. At the time of the trial Mr. Brandenburg was bedridden. During the time witness was at the Drive-In Garage he became acquainted with George D. French toward the end of September 1935. French came in and inquired about rates. A few days later he drove in a Chevrolet sedan to be stored in the garage. Four or five weeks later, or the early part of November 1935, Mr. French drove in a Chevrolet coupe. Both cars were stored in the

garage to and including the day of the accident. Mr. French paid the storage charges on the coupe and the sedan. No person other than Mr. French paid for the oil and gas for either of the two cars. There was a monthly account and Mr. French settled at the end of each month and he paid for washing each car. The charges on both cars were placed on one bill. Asked as to whether he saw a woman "ever pay any of these charges," he answered, "Not to my knowledge, not to me." Asked: "Did you see any woman in connection with either of those cars, the coupe or the sedan?", he answered: "Yes." He did not see her very often, maybe twice a week. He saw Mr. French every day. Asked as to how often Mr. French took the Chevrolet coupe out, he answered: "Well, he often stopped in, he got off the Illinois Central here, and came by, and the car that was there he would take out, whichever one it was." Questioned as to whether he had instructions from anyone not to permit Mr. French to take out the Chevrolet coupe, he answered in the negative. The keys of the coupe were in the car "because we had to deliver the car." The woman took the coupe out "maybe twice a week, maybe three times a week." He did not believe he ever saw Mr. French and the woman together, but he might have, but did not remember. He could not describe the woman. He did not see her enough "to really know her." There were Louisiana license plates on the coupe. The last time witness saw the coupe was on Sunday at about 5:45 when Mr. French called and asked to have the car delivered to his home. Witness delivered the car to Mr. French and "he got into the car with his children, and I walked back to the garage. He seemed to be in a hurry." Witness did not see the car thereafter. Asked: "Did anybody else use it?", witness answered: "Mr. French himself used it, this woman that you speak of used it, and the daughters used it." Asked: "And who did, for the most part, use the Chev-

rolet sedan?", witness answered that Mr. French's daughters used it more than anyone else.

Defendant introduced the deposition of Miss Edler taken by it at New Orleans on June 7, 1940. Asked as to who had authority or permission to use her car on March 15, 1936, she answered: "No one." Asked as to whether or not Mr. French had authority to use her car, she answered: "None." Asked if she gave Mr. French any permission to use her car on March 15, 1936, she answered: "I did not." Asked whether or not Mr. French had any general authority or permission from her to use her car, she answered: "None." She did not have any knowledge of the fact that Mr. French had her car out and was using it on the day of the accident. Asked whether or not she directed the garage authorities to allow Mr. French to use her car, she answered: "No." Asked: "Will you state whether or not, when Mr. French wanted to use that car, would he not ask your permission?", she answered: "He would ask permission." Asked whether he ever on any occasion asked permission to use the car, she answered: "Yes, he did." Asked: "What was the occasion?", she answered: "Well, several times he had used it, he would call me up and I would tell him he could use it." Asked whether on the day of the accident he was engaged in any errand for her, or any business of hers, she answered in the negative. On cross-examination, asked as to how many times prior to the accident Mr. French used her automobile, she answered: "I really can't recollect, because I really don't know, several times." She knew "it wasn't every week. Sometimes that car wasn't used very much, and most of the time it would be when I was with him that the car was used." To the question: "Now, he used it lots of times when you were not with him?," she answered: "Several times, not lots, several times." Asked: "Now, if he had a car of his own, why would he bor-

row your car?'', she answered: "Well, his children used his car most of the time." Asked as to the purpose for which he used the car, she answered: "Well, he would go to the Flossmoor Country Club, he used it several times for that, and a couple of times—in fact, I know he went down to the Hyde Park Hotel to see some relations of his one time, and I know on one occasion he went to a meeting of the Flossmoor Country Club, but it wasn't at the club, it was held somewhere in Chicago. I know he called me up and asked me if he could use it." Asked: "Now, when you would lend Mr. French this car, you say you would give him permission to use it?'', she answered: "Yes, when he would ask me, I would let him use it." Asked: "How would you give him permission?'', she answered: "He would call me and I would tell him he could use it, and he would go to the garage and get it." To the question: "He did not have to make any arrangements to get the car?'', she answered: "No, they were very lax over there. I don't think it mattered to them." To the partially completed question: "Whenever he wanted to borrow the car —?'', she answered: "He would call me and he would go and get it." Asked: "You did not have to call the garage to make any arrangements?'', she answered: "No." Asked: "Did you ever give Mr. French the extra set of keys?'', she answered: "No, it wasn't necessary, the other set stayed in the garage. We just needed one set to drive the automobile out." Asked: "Whenever he wanted to use the car you would let him use it?'', she answered: "Yes, whenever he would call me." To the question: "If he hadn't called you, it would have been all right to you?'', she answered: "Well, I don't think I would have made a fuss about it, you know, but he had always called me." To the question: "Just as a matter of courtesy, he would call you, is that right?'', she answered: "Well, it was my car, he called me because it was my car. It was for me to give permission

to use it." The interrogator reminded her of a conversation they had at the bank and asked her whether in that conversation she did not tell him that on the day of the accident Mr. French was going out to the Flossmoor Country Club. She answered that after the accident she was informed that Mr. French went out to the country club to get his wallet, which he had absent-mindedly left in his locker. Asked: "Didn't you tell me he borrowed your car to go out to the Flossmoor Country Club?", she answered: "Well, he borrowed it, I mean he took it, but I hadn't spoken to him about it. He borrowed it, whether I had given him permission or not, it was borrowed just the same." On the Sunday of the accident witness testified that she had dinner with Mr. French's children. She had expected him to be there for dinner, but he was not. She was informed that he left around 11:00 a. m. They had dinner about 1:30. At 3 or 4 that afternoon the children went to a moving picture theater. On the way there, they took witness to her hotel in Mr. French's sedan. Asked as to whether Mr. French had ever used her car before without calling her, she answered: "Not to my knowledge." Asked if Frances French had used her car only once, she answered: "To my knowledge, I mean, as far as was told me." Asked: "She could have gotten it over at the garage without your knowledge?", she answered: "Yes." Asked: "Just like Mr. French could have gotten it over there without your knowledge?", she answered: "Yes, that's right." To the question: "Did you leave any special instructions with the garage as to who was to have your car and who was not?", she answered: "No." On redirect examination she was asked: "If Mr. French or his daughter ever took that car out of the garage, was it taken out with your knowledge or consent?" she answered: "Only the one time for the daughter, and the times he had asked permission."

Did the evidence and the reasonable inferences therefrom warrant the jury in finding, in effect, that on the day of the collision George D. French was operating Josie Edler's Chevrolet coupe automobile with her permission? Defendant contends that the evidence shows that Mr. French did not have the permission of Miss Edler to use her car, and that nothing in the proof even tends to establish an implied permission to use her car. Defendant points out that when Mr. French called up Miss Edler and asked for permission she would give it to him, but that she did not give him blanket permission to use the car. Also, that Mr. French did not to her knowledge use the car without her permission, and that when he asked for it, she allowed him to take it. Defendant also points out that no one had authority or permission to use the car on the day of the accident, and that she did not give Mr. French general authority or permission to use her car and had not directed the garage authorities to allow him to use it. To sustain the contention that Miss Edler gave Mr. French permission to use the car, plaintiff points out that the parties were engaged to be married; that French arranged with the garage for accommodations for her car with her knowledge and consent; that he at all times paid the garage bills for her automobile, no bills ever being rendered to the assured; that the storage charges and other items for her automobile were charged directly to him and were paid by him; that she kept one set of keys and the other set of keys remained in the car; that when he requested the use of her car she permitted him to use it; that on at least two occasions he used the car with her permission; that he was never refused permission to drive her car; that he at all times had access to the car and in order to use it he merely went to the garage and secured the car without obtaining the express permission of Miss Edler. At times

French would get the car at the garage and call for the assured, and at other times he and the assured would go to the garage together and get the car. On the occasions when French got the car and called for Miss Edler, she would not give the garage any instructions as to whether or not he could take the car. She never left any instructions at the garage as to who was to use the car and who was not to use it. She never told the garage not to deliver the car to French. On the day French was driving assured's car, culminating in the accident, Miss Edler had dinner at the French home with French's children. His daughter Frances never knew that Miss Edler's coupe was not the property of French and did not know that it was Miss Edler's car. Miss Edler testified that French did not have to make any arrangements to get the car, that they were very lax at the garage and that she did not think it mattered to them. Plaintiff does not maintain that French had express permission from Miss Edler to use the car on the day of the accident. In its reply brief defendant points out that leaving a set of keys in a car is almost a universal custom as to cars kept in public garages. Commenting on the statement of plaintiff that French was never refused permission to drive the car, that he had access to the car and that in order to use it all he had to do was go to the garage and take the car without obtaining permission, defendant states that any person owning an automobile could be charged with giving any other person implied permission to use his or her automobile simply by reason of the fact that they had never been refused permission, and that the car was kept in a garage so that the person taking it out merely had to walk into the garage, turn the key in the ignition and drive the car out.

We have summarized the evidence and stated the positions of the parties. We considered the law applicable to an omnibus clause in *Byrne for use of King v. Continental Casualty Co.*, 301 Ill. App. 447. We differentiated the factual situation in that case from

other cases involving the omnibus clause decided in this district. We have held that where the assured permits another to use the car for a specified purpose and that person deviates from the purpose for which permission was given and uses the automobile for some purpose that is not within the scope of the permission given, nevertheless, the operator of a car remains an additional assured. These are known as deviation cases. In the *Byrne* case we held that the chauffeur took the car without permission and that he was not covered under the omnibus clause at the time of the accident. In determining whether Miss Edler gave Mr. French permission to use her car, we should consider the evidence as a whole. Viewing the case in the light of the relationship of the parties and considering the testimony as to their movements and conduct and the reasonable inferences to be drawn therefrom, we conclude that the jury was justified in finding that Mr. French, on the day of the fatal collision, was driving Miss Edler's car with her permission.

Defendant urges that the court erred in giving the following instruction:

"The jury are instructed that if you find from a preponderance of the evidence that Josie Edler, by her previous acts and course of conduct, gave implied permission to said George D. French to drive her automobile on the day in question, then you are instructed that the said George D. French was legally operating said automobile with the permission of the named assured, Josie Edler."

Defendant argues that this instruction left it entirely to the jury to say what constituted implied permission and gave the jury free rein to decide, as they saw fit, that the express permission of Miss Edler on three previous occasions, that she kept her car in the same garage as French, and that she left a key in her car in the garage, constituted an implied invitation to French to use her car at any time he saw fit without

any restrictions whatever. Defendant states that in the instruction the court does not intimate to the jury what acts or course of conduct might constitute an implied permission, and that in any event there is no proof in the record of an implied permission. Defendant also states that this instruction led the jury to place an unwarranted and strained construction on the omnibus clause of the policy, that the instruction gave to the jury an unlimited latitude by which they could decide what facts or theory could constitute an implied permission, and that a mere belief although in good faith on the part of the borrower of the car that he has an unlimited permission to use the owner's car, is not sufficient. Plaintiff calls our attention to an instruction given on behalf of defendant. This instruction quotes the omnibus clause of the policy and then tells the jury that if they find from a preponderance of the evidence under the instructions of the court that Mr. French at the time and place of the accident in question and in operating Miss Edler's car, had not at the time the permission of Miss Edler to so drive her car, their verdict should be for the defendant. Plaintiff points out that because of this instruction it became necessary for the court to instruct the jury that implied permission would be sufficient to allow the plaintiff to recover. We agree with the statement of plaintiff that the instruction to which defendant objects does not assume the existence of any facts and that the court did not intimate to the jury that the acts or course of conduct might constitute an implied permission. In our opinion, the court did not err in giving the instruction complained of.

We are of the opinion that the evidence presents a clear case of implied permission. Perceiving no error in the record, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

HEBEL and KILEY, JJ., concur.