Alice Hall, for the Use of Others, et al., Plaintiffs-
Appellees, v. Illinois National Insurance Com-
pany, Defendant-Appellant.

Gen. No. 61-O-1.

Fourth District.

February 17, 1962.

Rehearing denied March 27, 1962.

Wineland & Todd, of Flora, for appellant.

Meyer & Meyer, of Flora, and Ramsey & Ramsey, of Vincennes, Indiana, for appellee.

SCHEINEMAN, J.

This is a garnishment action brought in the name of the original defendant in certain personal injury suits, and for the use of the original plaintiffs in said suits, who had recovered judgments against her. It is

against the insurance company that had issued a policy in her husband's name, covering liability in the operation of his automobile. It is based on the clause in the policy which extends coverage to a person using the automobile with the permission of the named insured.

The cause was heard by the court without a jury and resulted in a judgment against the defendant insurance company. The company has perfected this appeal, and contends that, (1) Although the injuries occurred during the specified term of the policy, it had become void by its terms because the owner of the car had transferred title thereof to another without notice to the company. And, (2) the user of the car did not have the permission of the named insured, both because permission could not be given by one who did not own the car, and because permission was not given in fact.

There is much conflicting evidence, but we give first the facts as testified by Claude Hall, the named insured. He had acquired a new Pontiac in 1952, turning in a 1949 Ford and paying some cash, and his son Claude furnished some cash, but this had been repaid to him by the father. He had three sets of keys for the Pontiac, and gave one set to his wife and a set to his son. All three used the car, his wife more than he. At that time, and still at the time of the accident, June 6, 1953, he also owned a 1950 Ford. All three bought gas for the Pontiac during their respective use of it.

Sometime in the Spring of 1953, he and wife separated and she opened a restaurant business. She still had some clothing at his residence and occasionally slept there when he was away. He took some of his meals at her restaurant, and sometimes she prepared his lunch for him to take out when he was going to work. She made no charge for any of this. He and his

wife would have coffee and rolls together. During all this time she continued to use the Pontiac more than he did. The last time he saw it before the accident, it was parked in front of her restaurant.

 If the above statement of facts is the truth, we would hold it makes a clear case of permissive use. In granting permission to use a car, no special form of language is required, especially among members of the family. The mere supplying his wife with a set of keys is tacit permission to use, without any spoken words. The permission continues in effect until revoked by demanding the keys back or forbidding the use of the car or by some other act that indicates permission is withdrawn. It is not necessary that the permission be renewed each time the car is used. Fireman's Fund Indemnity Co. v. Freeport Ins. 30 Ill App2d 69, 173 NE2d 543; Goff v. New Amsterdam Cas. Co. 318 Ill App 586, 48 NE2d 584.

As for the alleged transfer of title, he testified: On February 2, 1953, his son got married. He went to a notary to have title to the Pontiac transferred to the son. The assignment of title was prepared and executed by him. He also had the notary prepare an application for 1953 license plates in his son's name. He put the title assignment in the glove compartment of the car. Later he had a conversation with his son, which was excluded on objection by the defendant. But the next day he went back to the notary, and had another application for license made out in his own name, and those in his son's name were destroyed. His application was sent in and he got the plates for that year. In the meantime, nothing was done with the title assignment, it remained in the glove compartment of the car for weeks. About two months after his marriage, the son went into military service.

█ █ If the foregoing is true, title did not pass from father to son prior to the accident. The time a transfer of title to an automobile becomes effective

170

is, by statute, made to depend on the intention of the parties. Ill Rev Stat, c 121½, Sec 18. (In effect in 1953.)

■ There is no doubt that Mr. Hall had intended to transfer the car to his son, but according to his statement he changed his mind for some reason. Perhaps the son advised against it on account of his impending military service. At any rate, he did change his mind, as indicated by his going back the next day and making the new application for license in his own name. This is corroborated by the notary. It is not the law, as defendant seems to believe, that title passed the moment his signature was put on the assignment. Such a rule would make the statute a nullity. The intention to make a gift is not effective until the gift is made by act that amounts to actual or symbolic delivery. (Telford v. Patton, 144 Ill 611, 620, 33 NE 1119; Hopkins v. Hughes, 340 Ill 604, 173 NE 100; In re Estate of Meyer, 317 Ill App 96, 45 NE2d 495; 24 Am Jur Gifts, Sec 27.) Perhaps a symbolic delivery could be made by phone, announcing to the donee that the car is now yours, and stating where he might pick it up. There is no testimony before this court of any actual carrying out of the gift, as of February 1953. The son was not produced as a witness by either side, either in person or by deposition.

As to the testimony of Mr. Hall, both on the question of permissive use and on the question of title, the defendant produced two impeaching witnesses. One was an agent of the defendant company, who told of a conversation with Claude Hall on June 10th, 1953, a few days after the accident. The other was a stenographer in the office of a law firm, where Mr. Hall was interrogated by an attorney, and the questions and answers were taken in shorthand and then transcribed. The agent's testimony was to the effect that Mr. Hall told him: "That is the boy's car and I want you to get it."

171

According to the stenographer's transcript, Mr. Hall, in reply to questions by the attorney, had said the boy kept the car until he left for the army, that his wife had wanted the car for use in her business, and the son said she could. Mr. Hall advised against it. He had seen the title in the car several times, and told the boy he better get it, or his mother would take it. Once she had taken it out of the compartment when the son was there, and she told the son and his wife she was going to keep the title. She still had keys to the car. Before he left, the son told his father the title was missing. Mr. Hall denied making the most important statements. Others he did not remember.

The defense introduced in evidence, a record of a divorce granted to Mr. Hall in the following year of 1954. But the strangest exhibits in the record are certified copies of documents in the Secretary of State's office, being an application for transfer of title to the junior Hall filed in 1954, the year after the event, together with applications for car licenses for both the years 1953 and 1954. The licenses were issued as requested. The assignment of title and the license applications all purported to be based on an assignment from Mr. Hall, Sr., dated Feb. 2, 1953 and presented something over a year later.

It is strange that, although there is no dispute that the elder Hall applied for and obtained 1953 license plates in that year, his son should apply for 1953 license plates in 1954 for the same car. It becomes more involved in this: when the photostat copy of the title assignment was shown to Mr. Hall, he denied that the purported signature was his. He continued to maintain that he had signed such a document on the date it bore, but persisted in declaring that his signature was not on this exhibit. No comparative signature was offered in evidence.

■ It is obvious that this case presents a difficult question of fact. Mr. Hall's testimony presents nothing in the way of impossibility, and the contradictions are mostly in supposed prior inconsistent statements, which goes to the credibility of the witness. Cleary, Handbook of Illinois Evidence, p 39.

■ It is the province of the trial judge, hearing the case without a jury, to determine the credibility of the witnesses and the weight to be given their testimony, and his judgment will not be disturbed unless manifestly contrary to the weight of the evidence. Rude v. Seiberg, 22 Ill App2d 477, 61 NE2d 39. We are unable to say, in this case, that the decision is contrary to the manifest weight of evidence. And if Mr. Hall's testimony is substantially true, we have noted that it makes a case sufficient in law for the garnishee plaintiffs to recover on the policy.

■ ■ The defendant also asserts that the court limited the defense too closely on cross examination. The rulings occurred during the plaintiff's case in chief, when certain cross examination was ruled out as not being within the scope of the direct. The scope of cross examination is largely a matter of discretion in the trial judge. This is especially true when the party still has the opportunity to call the witness again during his own case. Wheeler & Wilson Mfg. Co. v. Barrett, 172 Ill 610, 50 NE 325; Green v. Keenan, 10 Ill App2d 53, 134 NE2d 115. The judgment is affirmed.

Judgment affirmed.

HOFFMAN, P. J. and CULBERTSON, J., concur.