CAROLINE M. MUZICHUK, individually and as adminis-
tratrix, *vs.* LIBERTY MUTUAL INSURANCE COMPANY
& another
(and two companion cases[1]).

Suffolk.    April 9, 1974. — May 17, 1974.

Present: HALE, C.J., KEVILLE, & ARMSTRONG, JJ.

*Insurance,* Disclaimer of liability, Motor vehicle liability insurance,
Insured.    *Motor Vehicle,* Insurance.    *Damages,* For tort.

In the circumstances, where the registered owner of an automobile
gave his son general permission to use it for the son's own pur-
poses and never objected to others riding in it with the son, a
request by the father to the son to drive the automobile on an
errand to a certain place and to return home was not such a limi-
tation on the general permission given the son as to exclude the
son from the definition of "insured" in the noncompulsory coverage
of a policy of motor vehicle liability insurance on the automobile,
as including a person "using the . . . [automobile] with the per-
mission of the . . . [father] . . ., provided his actual operation . . .
thereof is within the scope of such permission," when the son, for
purposes of companions riding in the automobile with him,
deviated substantially from his route on returning home and
during the deviation the automobile was involved in an accident.
[270-271]
Evidence warranted a conclusion that there was no breach of the
coöperation clause in a policy of motor vehicle liability insurance
by an operator of the insured automobile where, even if statements
made by the operator to an investigator of the insurer after an
accident respecting the question whether the operator was an

---

[1] Robert W. Petrillo & another *vs.* Liberty Mutual Insurance
Company & another; Allen Oi & another *vs.* Liberty Mutual
Insurance Company & another.

unnamed insured under the policy were false, the statements were not made with an intention to deceive and were due to the operator's ignorance of their legal consequence. [271-275]

In a suit in equity to reach and apply the obligation of the insurer under a policy of motor vehicle liability insurance in satisfaction of a judgment recovered by the plaintiff in an action of tort for personal injuries against the operator of an automobile involved in an accident, where the insurer in this court requested that the suit be remanded to the trial court for the purpose of setting off an amount asserted to have been received by the plaintiff in a settlement made in the tort action by another defendant therein, but no evidence of the amount of any such settlement was presented on the question of damages at the trial of the tort action or offered at the hearing of the suit, and a decree in the suit in favor of the plaintiff made no reference to any offset, this court declined the request for a remand as inappropriate on the record and affirmed the decree. [276]

BILLS IN EQUITY filed in the Superior Court on August 13, 15, and 19, 1969.

The suits were heard by *Kent B. Smith*, J.

*James D. Casey* for the defendant.

*Howard J. Alperin* for the plaintiffs.

HALE, C.J.   On March 10, 1968, one Leonard Lappin (Leonard) was operating a motor vehicle in which Paul Muzichuk, Allen Oi, and Robert Petrillo were passengers. The car was involved in an accident; Muzichuk was killed, and Leonard, Oi, and Petrillo all received serious injuries.   Actions were brought against Leonard and his father Henry Lappin (Henry), to whom the car was registered.   After trial in June, 1969, verdicts were directed in favor of Henry, and judgments were entered against Leonard.   The holders of the executions issued on the judgments brought the instant suits to reach and apply the obligation of Liberty Mutual Insurance Company (the defendant) under a motor vehicle liability insurance policy issued by it in satisfaction of the judgments, which the plaintiffs claim are covered by that policy.

The cases were tried before a Superior Court judge (first judge) who resigned without rendering any decision.

The cases were then reassigned to another judge (second judge), and by agreement of the parties were submitted to him for decision on the evidence, consisting of the testimony and exhibits introduced at the trial before the first judge. The parties stipulated that the cases be decided by the second judge "as though the court heard the case[s] live." Compare *Skil Corp.* v. *Barnet,* 337 Mass. 485, 487-488 (1958). The second judge made findings of fact and rulings of law and ordered the entry of final decrees that the judgments for damages obtained by the plaintiffs were within the risks covered by the liability policy issued by the defendant to Henry and that the amounts of said judgments and executions thereon be paid by the defendant, together with costs. The defendant has appealed from the final decrees entered pursuant to that order, and those appeals have been consolidated inasmuch as the issues raised by the appeals are common to each case.

The issues presented are: (1) was Leonard, while operating the motor vehicle at the time of the accident, an insured under Coverage B of the policy of insurance issued by the defendant; (2) if Leonard was such an insured did he commit a breach of the terms of said policy by failing to coöperate with the defendant during the investigation of the cases, in the preparation of the cases for trial, and at the trial itself; and (3) is the defendant entitled to an offset against the judgments on the personal injury claims for amounts alleged to have been received from the owner and operator of another motor vehicle which was involved in the accident?

Since the second judge had before him only documentary evidence, all of which is before us, we are in as favorable a position to reach conclusions as he, and we do so unaffected by his conclusions. *Malden Trust Co.* v. *Brooks,* 291 Mass. 273, 279 (1935). *Webber* v. *Rosenberg,* 318 Mass. 768 (1945). *Hiller* v. *Submarine Signal Co.* 325 Mass. 546, 551 (1950). *Matsushita Elec. Corp. of America* v. *Sonus Corp.* 362 Mass. 246, 250-251

(1972). Having examined the entire record, we reach the same conclusions reached by the second judge, with some additional findings of fact. We summarize the facts found by the judge and by us.

At all times material to this case, Henry lived with his wife, Regina, and their two sons, Leonard and Barry, at 117 Bay State Road, Boston. Henry owned two cars, a Pontiac and an Austin-Healy. Both were registered in his name. On the date of the accident, which involved the Pontiac, there was in force a "Massachusetts Combination Motor Vehicle Policy," issued by the defendant with respect to the Pontiac. The policy included "Coverage B"[2] with "limits of liability" of $100,000 as to each person and $300,000 as to each accident.

Shortly after the purchase of the Pontiac in 1965, Henry gave duplicate sets of car keys to his wife and to Leonard. Henry, a licensed physician, was unable to operate a motor vehicle because of an eye condition. As he could not drive, his wife or Leonard would drive him whenever a need arose. From the time the Pontiac was purchased until March 10, 1966, it was used by Leonard at least once a week. Henry never restricted Leonard's use of the Pontiac except when he needed the car and a driver to visit a patient. Henry knew that Paul Muzichuk and others rode with Leonard. He never objected.

At approximately 3:00 P.M. on March 10, 1966, Leonard was at Muzichuk's house when he was summoned home by his mother. When he arrived there Henry told him to take his brother Barry to a garage in Wellesley Hills (Crandall-Hicks) in order for Barry to pick

---

[2] "Coverage B — Bodily Injury Liability — Other than Statutory — . . . The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the motor vehicle."

up the Austin-Healy, which was being repaired. Henry told Leonard to take the Pontiac and to return home. Henry did not set a time before which the Pontiac was to be returned.

Barry, with Leonard as a passenger, drove the Pontiac to Muzichuk's house where they picked up Muzichuk and Petrillo. At about 3:30 P.M. Barry drove to Crandall-Hicks. The drive took about twenty minutes. Barry left the car, and Leonard drove back to Boston with his two passengers. In Boston he drove to an ice cream shop and met Oi at a pool parlor next door. All except Leonard went into the ice cream shop seeking employment. When they came out Leonard, with Muzichuk, Petrillo, and Oi as passengers, drove to Storrow Drive, over the Harvard Bridge, onto Memorial Drive, and then to Harvard Square to another ice cream shop. It was then about 5:00 P.M. At that point Leonard was about three miles from his home on Bay State Road. After leaving the ice cream shop in Harvard Square with his passengers, Leonard drove to Memorial Drive, where the accident happened at 5:22 P.M.

Leonard was interviewed by a representative of the defendant on December 13, 1966, and on January 3, 1967. He answered all questions and coöperated fully. At the trial before the first judge he was examined intensely by the lawyers for the three plaintiffs and by the lawyer for the present defendant.

1. The relevant policy provision defining the word "insured" is found in part I, section III(a): "With respect to the insurance under coverages B and C, the unqualified word 'insured' includes . . . (2) any other person using the motor vehicle with the permission of the named insured or such spouse, provided his actual operation . . . thereof is within the scope of such permission . . .."

Leonard's use of the vehicle at the time of the accident was beyond what was needed to carry out his father's request to convey Barry to Crandall-Hicks and to return home. It is clear that Leonard's use of the car that day

to drive his friends to Cambridge was within the scope of the broad general permission Henry had given him to use the vehicle for his own business and pleasure. Thus, in making such use of the car, Leonard would have been an "insured" within the terms of the policy unless (as the defendant argues and as we assume without deciding) Henry had imposed a limitation on that permission by telling Leonard to return home as soon as he dropped Barry off in Wellesley Hills.

We are of the opinion that Henry's statement to that effect was not such a limitation on the general permission given to Leonard. Henry did not state any time for his son's return. Any need for the car for his own transportation was not clearly stated. Leonard was permitted to use the car on weekdays as well as on weekends. On some occasions prior to using the car he had asked his mother or father if either had need of it. He used his own judgment as to the use of the car. We are impressed by the facts that this car was available to Henry, to his wife and to Leonard, and that on the occasions when Leonard had questioned his parents as to their need for the car his purpose had been to avoid conflicts between his use of the car and that of his parents. Upon all of the evidence we find that the permission granted Leonard was general and uninterrupted. It was not a series of permissions interspersed with periods of no permission. See *Hall* v. *Illinois Natl. Ins. Co.* 34 Ill. App. 2d 167, 169-170 (1962). *Small* v. *Schuncke*, 42 N. J. 407, 413-415 (1964). Blashfield, Automobile Law and Practice (3d ed.) §§ 315.10, 315.11. Contrast *Blair* v. *Travelers Ins. Co.* 291 Mass. 432, 433, 436-437 (1935); *Kneeland* v. *Bernardi*, 317 Mass. 517, 519-520 (1945).

2. The defendant contends that its policy cannot be reached and applied because of Leonard's breach of the policy terms concerning coöperation.[3] It argues, cor-

---

[3] "Under Parts I and III the insured shall cooperate with the company and, upon the company's request, assist in making settle-

rectly, that the plaintiffs' rights are no greater than Leonard's under the policy (*Salonen* v. *Paanenen*, 320 Mass. 568, 575 [1947]) and that if the insured is not entitled to coverage, the plaintiffs are not entitled to recover the proceeds of the policy. *Cassidy* v. *Liberty Mut. Ins. Co.* 338 Mass. 139, 143 (1958). The intentional furnishing of false information of a material nature either before or at trial is a breach of the coöperation clause. *Id.* at 142. It is not necessary that the defendant show that it has been prejudiced by such a breach. *Polito* v. *Galluzzo*, 337 Mass. 360, 365 (1958).

We have considered all of the evidence pertinent to the question whether Leonard made any intentionally false statements to the defendant. Following the accident on March 10, 1966, Leonard was hospitalized for five months, after which he returned home. On December 13, 1966, he was interviewed by an investigator employed by the defendant. He was interviewed again on January 3, 1967, at the instance of the investigator's supervisor, for the purpose of obtaining more information regarding the permission given Leonard to use the car. The investigator took no notes at the interviews but did make a recording of each with a portable device. The recordings were inaudible in many places. However, transcripts of the audible portions were read into the record at the trial.

The first interview was for the purpose of obtaining answers to interrogatories propounded by the plaintiffs Oi

---

ments, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury sickness or disease, including death at any time resulting therefrom, and injury to or destruction of property, including loss of use thereof, with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than expense under Part I for first aid to others at the time of accident, or under coverage D."

in connection with their action for damages. We set out the pertinent parts of that interview below.[4]

We consider that Leonard tried to distinguish the fact that he had general permission to use the car from the fact that he had no specific permission for the trip during which the accident occurred. It will be noted that the part of the recording where this might have been explained is not audible. We have no way of knowing what conversation took place at that time, but the last question and its answer make it obvious that some words were spoken.

The second interview was more detailed.[5] With the exception of the words "right back" and "directly home"

---

[4] MR. DOWNING (the investigator): "Was the motor vehicle in the alleged accident being operated at the time with permission to do so from the owner?"

LEONARD: "Yes."

MR. DOWNING: " — with the permission to do so. Are you sure? What permission did you have at the time of the accident?"

LEONARD: "I didn't have any permission at the time of the accident."

MR. DOWNING: "O. K. So that I will repeat the question. Was the motor vehicle in the alleged accident being operated at the time with permission to do so from the owner?"

LEONARD: "No."

\*     \*     \*

MR. DOWNING: "What permission did you have to use the car at the time of the accident?"

(Inaudible)

MR. DOWNING: "So that I will repeat the question. Was the motor vehicle in the alleged accident being operated at the time with permission to do so from the owner?"

LEONARD: "No."

[5] The pertinent parts of the transcript of that interview are:

MR. DOWNING: "O. K. Now, talking about your getting possession of your father's car, could you tell me where you were when you

the statements given the investigator were substantially the same as Leonard's testimony at the trial before the

received permission? In your own words tell me how it came about that you came to use your father's car?"

(Inaudible)

MR. DOWNING: "O. K. Now, you say you were over Paul Muzichuk's house and you received a phone call from your mother?"

LEONARD: "Yes."

MR. DOWNING: "Could you relate this conversation with your mother to the best of your ability — what she said and what you said?"

LEONARD: "Do you want me — She wanted me to return to the house and drive Barry to Crandall-Hicks and get his car and drive her car back."

\*       \*       \*

MR. DOWNING: "All right. Did you ask her for any extended permission to use the car?"

LEONARD: "She wanted me to return to the house and drive Barry to Crandall-Hicks and go with him to Crandall-Hicks and get his car and drive her car back."

\*       \*       \*

MR. DOWNING: "When she told you what you were to do with the car did you ask her if you could use it for your own purposes?"

LEONARD: "No, I didn't."

MR. DOWNING: "Well, O. K. Now, your mother called you and she told you she wanted you to accompany Barry to Crandall-Hicks?"

LEONARD: "Yes."

MR. DOWNING: "And then bring the car back?"

LEONARD: "Yes."

MR. DOWNING: "You asked her if you could use the car after you dropped Barry off?"

LEONARD: "No. She wanted me to return home."

MR. DOWNING: "Did you ask her if you could?"

LEONARD: "No, I didn't."

MR. DOWNING: "O. K. Was she explicit in her instructions?"

LEONARD: "Yes, she was."

first judge. Assuming that those words amounted to false statements, we are nonetheless convinced on the basis of the entire record that they were not made with an intention to deceive and were due to Leonard's ignorance of their legal consequence. See *Jertson* v. *Hartley,* 342 Mass. 597, 602 (1961).

---

MR. DOWNING: "Why was she? Did her [*sic*] and your father have some use for the car?"

LEONARD: "Yes, they did."

MR. DOWNING: "Did they tell you what they wanted to use the car for?"

LEONARD: "He had to go on an examination."

MR. DOWNING: "It was your understanding when you took the car that you were to accompany Barry to Wellesley and then drive the car where?"

LEONARD: "Directly home."

*    *    *

MR. DOWNING: "Now, is there any question in your mind as to what you were supposed to do with the car? I know you've told me that your mother told you to come right back to the car [*sic*]. Is that correct?"

LEONARD: "Right."

MR. DOWNING: "You agree with that?"

LEONARD: "Yes."

MR. DOWNING: "Instead of doing this, you just — (inaudible) O. K. Leonard. I don't have any further questions to ask you except did you have to deviate from your route from Wellesley to your house as contrasted from Wellesley to Massachusetts Avenue and to Brigham's there?"

LEONARD: (Inaudible)

MR. DOWNING: "Did you feel at any time in your ride from the minute you picked up Paul Muzichuk and Robert Petrillo that your parents knew that you were in the car?"

LEONARD: "They didn't know at all."

MR. DOWNING: "Would they have consented to their being in the car had you asked them?"

LEONARD: "I think so."

3. The defendant asserts in its brief that at the time of the basic tort action against Leonard before a Superior Court judge and jury a party defendant in that action (who is not a party to this proceeding) made settlements for unknown amounts with the plaintiffs, and requests us to remand the case, if our holding is otherwise adverse to it, for the purpose of setting off the amounts received by the plaintiffs from such "settlements."[6]

In order to mitigate damages a defendant is entitled to introduce in evidence the amount of money paid or promised to a plaintiff by a joint or concurrent tort-feasor on account of the same injuries. *Daniels* v. *Celeste*, 303 Mass. 148, 152 (1939). *Karcher* v. *Burbank*, 303 Mass. 303, 306 (1939). *Tritsch* v. *Boston Edison Co*. 363 Mass. 179, 182 (1973). While the "settlements" in this case are said to have occurred during the trial of the tort actions, evidence of the amount received was not presented to the jury for their consideration in determining the amount of damages to be assessed. No evidence of the amount of any such "settlement" was offered before the first judge. The matter was merely mentioned before the second judge in the form of a request by the defendant's attorney to an attorney for one of the plaintiffs that the latter, if possible, obtain for the defendant "the document by which he settled in part his case." The record in this case is otherwise barren of any information concerning this "settlement." The final decree makes no reference to any offset, and no error is demonstrated by this record in the second judge's having failed so to do. We do not consider it appropriate on this record to remand the case as the defendant requests. See *Tritsch* v. *Boston Edison Co., supra,* at 183.

*Decrees affirmed.*

---

[6] The defendant does not claim that any amounts received in connection with the death claim may be offset.